**Jane L. Moisan,** OSB No. 181864
peopleslawproject@gmail.com
PEOPLE'S LAW PROJECT
818 S.W. 3rd Avenue #221-3789
Portland, OR 97204
Phone (971) 258-1292

**Kenneth Kreuscher,** OSB No. 066189
KennethKreuscher@gmail.com
KENNETH A. KREUSCHER LAW LLC
POB 12625
Portland, OR 97211
Ph: (971) 303-9453

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

# PORTLAND DIVISION

|  |  |
|---|---|
| **ROBERT EVANS, BEA LAKE, and SADIE OLIVER-GREY, Individually and on behalf of similarly situated individuals,** | Case No. 20-CV-01142 (SI) |
| **Plaintiffs,** | FIRST AMENDED COMPLAINT |
| **v.** | |
| **CITY OF PORTLAND, a municipal corporation,** | |
| **Defendant.** | |

Plaintiffs ROBERT EVANS, BEA LAKE, and SADIE OLIVER-GREY, by and through their attorneys, allege the following:

**NATURE OF ACTION**

**1.**

Plaintiffs bring this action to stop law enforcement officers from engaging in collective punishment of lawful, nonviolent, and/or passively resistant protesters and those documenting the Black Lives Matter protests in Portland, Oregon. Since May 29, 2020 and on every night thereafter, protesters in Portland, Oregon, across the country, and indeed internationally, have taken to the streets to protest white supremacy and the lack of police accountability to the public they serve.

**2.**

In response to the protests, law enforcement has meted out disproportionate violence and turned protests into warzones, skewing the message of the movement, and interfering with protesters' Article I, section 8 of the Oregon Constitution right to freedom of speech and press. Further, Defendants actions constitute an attempt to monopolize the flow of information to the public. Plaintiffs bring this action and ask the Court to restrain Defendants from further indiscriminate violence and threat of arrest without individualized probable cause.

**JURISDICTION AND THE PARTIES**

**3.**

Plaintiffs' claims arose in the City of Portland, Multnomah County, and under the law of the State of Oregon.

**4.**

Plaintiffs complied with all necessary obligations pursuant to ORS 30.275 *et seq*. by filing this lawsuit within 180 days of the accrual of their injuries.

**5.**

At all relevant times, Plaintiff Robert Evans (Pronouns: he/him) is a resident of the State of Oregon and Multnomah County.

**6.**

At all relevant times, Plaintiff Bea Lake (Pronouns: she/her) was a resident of the State of Oregon and Multnomah County.

**7.**

At all relevant times, Plaintiff Sadie Oliver-Grey (Pronouns: she/her) was a resident of the State of Oregon and Multnomah County.

**8.**

Defendant City of Portland ("City") is a municipal entity created and authorized under the laws of the State of Oregon and is the employer of individuals who work as law enforcement (hereinafter "officers"), some of whom were at times responsible for tortiously and unlawfully arresting, retaliating, and using force against lawful, nonviolent, and/or passively resistant protesters and those documenting the Black Lives Matter protests in Portland, Oregon. Defendant City is authorized to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant City assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attached to the public consumers of the services provided by the Portland Police Bureau ("PPB"). Per ORS 30.265(3) and 30.285(1), the city is the named party in this action as the employer of individual police officers in the PPB and must indemnify its officers for their tortious acts and is therefore liable for the purposes of this action by Plaintiffs.

## FACTUAL ALLEGATIONS

### 9.

**George Floyd: Black Lives Matter Protests**

On May 25, 2020, in Minneapolis, Minnesota, a Black man named George Floyd was murdered on video by Officer Derek Chauvin of the Minneapolis Police Department while three of his fellow officers watched and did nothing to intervene. Officer Chauvin knelt on Mr. Floyd's neck while Mr. Floyd pleaded for his life, repeatedly telling Chauvin that he could not breathe. A bystander video of the murder quickly went viral, sparking outrage throughout the country.

### 10.

For many Americans, and particularly Black Americans, the murder of George Floyd by police officers in broad daylight, while the officers were being openly filmed by a witness, was the proverbial straw that broke the camel's back. Fed up with the empty platitudes and the endless yet ineffective "reforms" by the political and law enforcement establishment, millions of Americans took to the streets in protests, demanding an end to police violence and white supremacy, and refusing to leave those streets unless and until meaningful change is made.

### 11.

Protests have been met with police violence in nearly every city around the country. Videos shared in the press and on social media show the police in this country out of control, including in their unprecedented attacks on journalists. Law enforcement across the country has targeted and interfered with the ability of protesters, citizen journalists, and even credentialed journalists to document and inform the public about this police misconduct.

**12.**

Eyewitness reporting of police conduct plays an important and powerful role in the Black Lives Matter protests, and police response during these events has become a matter of public concern in its own right. Police often characterize these protests as dangerous for journalists, and as a result few commercial news outlets are present to report during the demonstrations. Much reporting via large commercial outlets therefore relies on law enforcement press statements issued after the fact, or on footage obtained from citizen journalists.

**13.**

Citizen journalists include independent documentarians as well as participant observers, who use smartphones and mobile technologies to record police conduct during protests. These recordings reach a global audience through services including Facebook Live, Periscope, and others, which allow users to record and share audiovisual recordings in real-time, via "live streaming." Ten million people have Periscope accounts, and collectively watch 40 years' worth of Periscope live broadcasts every day.[1]

**14.**

The public interest in keeping live-streamers and citizen journalists on the streets is strong. On many occasions, police departments have issued statements alleging that protesters were engaged in unlawful activities, and livestreams have provided the evidence to refute these claims. Footage gathered by citizen journalists is frequently the only source of information outside of police statements, and thus the only way to document misrepresentation of facts by law enforcement to justify police violence.

---

[1]    Periscope, Periscope, by the numbers (Aug. 12, 2015),
       https://medium.com/periscope/periscope-by-the-numbers6b23dc6a1704#.9ja29il34.

**15.**

Furthermore, the ability of the public to view live coverage of protests across the country and the world of people taking to the streets to demand justice and police accountability is important for inspiring political action and movement building.

**16.**

**Portland, Oregon**

Beginning on May 29, 2020, and on every night since then, Portlanders have been demonstrating in the streets demanding justice for George Floyd and demanding an end to police violence.

**17.**

The PPB, like police departments throughout the country, have met these demands with violence and attempts to interfere with the rights of protesters and individuals seeking to document the protests.

**18.**

On each night of protests, Defendant has declared the protests an "unlawful assembly" – and more recently, "riot," -- without consistent or clear criteria for the basis of that declaration and without clarity as to the geographical size of the zone allegedly encompassed in that designation or the duration of that designation.

**19.**

On the basis of those declarations of "unlawful assembly" and "riot," Defendant has justified collectively punishing the assembled crowds with "less lethal" weapons, including chemical weapons such as smoke, 2-chlorobenzalmalononitrile ("CS gas"), Oleoresin Capsicum Pyrotechnic ("OC" pyrotechnic"), and OC vapor (hereinafter referred to collectively as "CS

gas"); and with munitions such as 40mm or FN303 or rubber ball distraction devices (hereinafter referred to as "munitions"). CS gas and munitions (also referred to by law enforcement agencies as "riot control agents") constitute a significant use of force.

**20.**

Between May 29, 2020 and June 8, 2020, the Defendants used riot control agents and arrested individuals assembled indiscriminately and without individualized probable cause.

**21.**

Upon information and belief, the Defendants somewhat decreased the usage riot control agents until the nightly protests crossed the river to the east side of Portland and focused on police buildings. On June 25, 2020, PBB declared an unlawful assembly at the PPB's North Precinct and deployed CS spray and riot control agents against the demonstrators.

**22.**

On June 30, 2020, Governor Brown signed House Bill 4208 into law, which prohibits the use of teargas on a crowd absent certain prerequisite notice and absent circumstances that constitute a "riot." Just a matter of hours later, during a protest near the Portland Police Association's headquarters on North Lombard Street, the Defendants declared, for the first time since protests began, a "riot."

**23.**

Defendants' use of indiscriminate force against those documenting and participating in Black Lives Matter protests has also caused a massive deterrent impact on individuals who would, but for the threat of unlawful arrest and physical harm from the police, join the protests or cover the protests as members of the media.

24.

**Oregon Law Pertaining to Crowd Control and the Right to Protest**

### *Unlawful Assembly*

"Unlawful assembly" is not a crime in Oregon. *State v. Stephanus*, 53 Or 135 (1909). Passive resistance is defined by ORS 162.247, and refers to noncooperation with a lawful order of a peace officer that does not involve violence or active conduct. *See State v. McNally*, 361 Or 314, 339 (2017).

25.

An individual may not be arrested for engaging in passive resistance. ORS 162.247(3)(b). The criminal statute providing for the arrest of an individual interfering with an officer or arrest for refusing to obey a lawful order specifically prohibits the arrest of a person engaging in passive resistance. ORS 162.247 ("Interfering with a Police Officer"); *See, State v. West*, 298 Or App 125, 138 (2019) ("Because defendant engaged in passive resistance during demonstration, he could not be convicted of interfering with a police officer.")

26.

Portland Police Directives 0635.10 ("Crowd Management/Crowd Control") and 1010.00 ("Use of Force") govern law enforcement conduct authorized in circumstances where a civil disturbance or unlawful assembly may exist.

27.

Portland Police Directive 0635.10 (hereinafter "Crowd Control Directive") defines a "civil disturbance" as:

> An unlawful assembly that constitutes a clear and present danger of riot, disorder, interference with traffic upon the public streets or when another immediate threat to public safety, peace or order appears.

"Passive resistance" is defined in the same Section as "a person's non-cooperation with a [officer] that does not involve violence or other active conduct by the individual."

Portland Police Directive 6.4.6. ("Riot Control Agents (RCAs) or Area Impact Munitions") prohibits the use of riot control agents against a passively resisting crowd, or against a crowd without avenues of escape.[2]

## 28.

The Crowd Control Directive authorizes use of riot control agents in order to prevent violence, injury, or property damage when no other reasonable alternative is apparent.[3] However,

---

[2] Portland Police Directive 6.4.6.1. Authorized Uses in Crowd Control.

6.4.6.1.1. Under the direction of the Crowd Management Incident Commander (CMIC), to disperse a crowd, when a demonstration or event becomes a civil disturbance, as defined in Directive 635.10, Crowd Management/Crowd Control.

6.4.6.1.2. To stop or disrupt a group of individuals committing a crime or about to commit a crime, when other more discriminate methods are not feasible or reasonable, and uninvolved parties are unlikely to be subjected to the use of force.

6.4.6.1.3. When a person(s) engages in physical resistance or indicates the intent to engage in physical resistance.

6.4.6.1.4. In exigent circumstances to defend the member or others from physical injury when other, more discriminate methods of applying force are not feasible and uninvolved parties are unlikely to be subjected to the use of force.

6.4.6.2. Restricted Use.

6.4.6.2.1. Members shall not use RCAs or area impact munitions on a crowd engaged in passive resistance that does not impede a lawful objective.

6.4.6.2.2. Members shall not deploy RCAs or area impact munitions to disperse a crowd when avenues of escape are unavailable to the crowd.

9.1. Pursuant to ORS §131.675, the IC [Incident Commander] may order the crowd dispersed when a demonstration or special event becomes a civil disturbance.

9.1.1. Before giving the order to disperse, the IC must consider whether dispersal unduly endangers the public, police or participants in the crowd.

9.1.2. Prior to taking police action to disperse the crowd, and when tactically feasible and time reasonably permits, members shall issue a minimum of two warnings at reasonable intervals to allow the crowd to comply.

9.2. When the crowd has been ordered to disperse and does not heed repeated warnings, and no reasonable alternative is apparent, riot control agents (RCAs) and/or special impact munitions may be deployed to prevent

---

it expressly prohibits the use of riot control agents for the sole purpose of dispersing a crowd.[4]

### 29.

### *Impunity in the Face of Community-Led Reforms: Declaring Riots*

On June 30, 2020, Governor Kate Brown signed House Bill 4208 into law, which prohibited the use of CS spray for crowd control except in circumstances where a riot has been declared. A matter of mere hours after the law was enacted, Defendants declared a riot. PPB has declared a riot almost every night since, despite coverage by journalists that demonstrate that there were no grounds to designate the assembly as a riot. As onlookers and protesters have repeated over and over, the only "riots" discernable are the riots the Defendants themselves are creating.

### 30.

ORS 166.015 ("Riot") states that "[a] person commits the crime of riot if while participating with five or more other persons the person engages in tumultuous and violent conduct and thereby intentionally or recklessly creates a grave risk of causing public alarm."

### 31.

The PPB Crowd Control Directive defines a "riot" differently and as "[s]ix or more persons engaging in tumultuous and violent conduct and thereby intentionally or recklessly creating a grave risk of causing public alarm, excluding persons who are engaged in passive

---

violence, injury or property damage and to avoid a greater application of force.

9.2.1. These weapons shall only be used at the direction of the CMIC and when avenues of escape (i.e., clear path or route) are available to the crowd.  Pursuant to this policy and Directive 1010.00, Use of Force, members must issue warnings prior to deployment.

9.3. Force shall only be used in accordance with Directive 1010.00, Use of Force.

[4]    Crowd Control Direction, Procedure §10.2 provides, "Members shall not deploy specialty impact munitions or aerosol restraints indiscriminately into a crowd."

resistance."

**32.**

Upon information and belief, the Defendants have declared a "riot" based on the action of less than five individuals within the protests and thereby justified the escalation of their own use of force.

**33.**

Upon information and belief, there is no duration of time or defined area limitations specifying at what point a declaration of an "unlawful assembly" or a "riot" should be lifted as applied to the crowd.

**34.**

**The Right to Document and Create Media Related to Police Conduct**

During the Black Lives Matter protests, Defendants have unlawfully targeted and interfered with citizen journalists and those filming the police in their efforts to document police conduct and to obtain identities of law enforcement officers.

**35.**

Oregon law expressly entitles participants in a protest to record the police. The Oregon Legislature passed House Bill 2704 in the 2015, amending ORS 165.540 to allow persons to openly film and record officer conduct in the course of their duties.

**36.**

Portland Police Directives clearly explain this right. Portland Police Directive 635.20 ("Community Member Observation of Police," hereinafter "Observation of Police Directive") sets forth:

> All persons have rights under state and federal law to observe and record police
> officers performing official duties, so long as that person's actions do not interfere

with the member's duties or the safety of members or others, are consistent with reasonable restrictions, do not amount to criminal trespass, or otherwise violate the law.

## 37.

Per the same Directive, officers may not seize media without the written consent of the person who captured the media and without documenting the seizure in a police report. Observation of Police Directive §§ 3.2; 3.3. Further, seized media must be returned after a period of time reasonably necessary for obtaining a warrant. Observation of Police Directive § 4.

## 38.

PPB's Crowd Control Directive § 12 provides that "[officers] will not interfere with media or legal observers performing their respective functions, so long as they are performed in a safe manner and in compliance with police orders."[5] Further, the Crowd Control Directive provides that each arrest must be made with articulable and individualized probable cause. *Id.* at § 12.3.

## 39.

While the public may not be entitled to learn an officer's identity in the course of a demonstration, an officer who detains or retaliates against an individual requests an officer's identity is directly retaliating against that individual's Article I, section 8 right to freedom of speech and press.

---

[5]    12.1.   Absent exigent circumstances, arrests should only be made when authorized by the IC.
12.2.   Careful consideration should be given to the timing, location, and method of the arrest and resources available.
12.3.   To effect arrests, members must be able to articulate the individualized probable cause for the arrest of each person.
12.4.   Media or legal observers will not be arrested solely for their role in observing, capturing, and/or reporting on demonstrations or events.  Members will not interfere with media or legal observers performing their respective functions, so long as they are performed in a safe manner and in compliance with police orders. However, such persons must comply with all police orders and maybe subject to arrest for failure to do so.

**40.**

**Plaintiff Robert Evans: Defendants Declare an "Unlawful Assembly" and a "Riot" Without Justification or Limitation, Justifying Collective Punishment and Interfering with Creation of Media.**

Since 2015, Plaintiff Robert Evans has been employed as a conflict journalist in areas such as Iraq, Syria and Ukraine. He has helped teach classes in counterterrorism at several U.S. universities. Since 2018, he has been an investigative journalist with *Bellingcat*, and a podcaster with *iHeart radio* since 2019. Mr. Evans has covered protests in Portland for several years and began covering the Black Lives Matter protests from the first night of demonstrations.

**41.**

In covering the protests, Mr. Evans has observed that the threat of bodily harm and public safety during demonstrations has come from the police themselves rather than protesters. Police violence and unlawful conduct has repeatedly resulted in injury to Mr. Evans and his staff, prevented coverage and caused severe fear and distress in carrying out his work. At all relevant times, Mr. Evans has been clearly identifiable as press due to the gear he and his staff use, his press pass, and a helmet labeled "PRESS."

**42.**

On the second night of protests, May 30, 2020, Mr. Evans and his crew were covering the march across the Hawthorne Bridge. As the crowd approached the east side of the bridge, Mr. Evans was filming the arrest of a protester when officers threatened him with arrest if he did not disperse. Forced to leave, Mr. Evans was unable to document and report on numerous subsequent arrests that night.

**43.**

On Sunday, June 1, 2020, a crowd marched to the Justice Center. At approximately 11:30

PM, Defendants declared an unlawful assembly. Mr. Evans did not witness conduct on the part of protesters giving rise to that designation, but nevertheless Defendants began launching CS spray indiscriminately into the large crowd.

**44.**

Mr. Evans retreated with protesters and was a few blocks from the Justice Center when a police riot vehicle drove past and shot at him directly with a tear gas grenade, hitting his foot. The gas caused him to choke and have trouble breathing, as well as increased his risk of exposure and susceptibility to COVID19. The Defendants carried on, gassing protesters and firing munitions in the very same the direction in which they were directing the crowd to disperse.

**45.**

Ultimately, Mr. Evans was forced to abandon his attempts to cover the protest that night due to his fear of possible arrest and physical harm.

**46.**

On June 2, 2020, Mr. Evans was again forced to evacuate and cease reporting due to the Defendants creation of a risk of serious bodily harm. Defendants used CS spray against the demonstrators at the Justice Center from all sides and without lawful justification. Mr. Evans witnessed officers hopping off police vehicles at random to arrest protesters lawfully conducting themselves. Mr. Evans and his staff walked out of downtown that night with their hands in the air and their Press passes out.

**47.**

On the night of June 5, 2020, at or around 10:00 or 11:00pm, Mr. Evans was documenting Defendants' attempt to disperse the crowd near the Justice Center. Defendants had

formed the crowd into a group and Mr. Evans was filming with his press pass in one hand and camera in the other. Upon information and belief, PPB officers shot his hand holding his press pass with what he understood to be a pepper ball.

## 48.

The following night, on June 6, 2020, Mr. Evans did not attend the protest, but asked his staff to cover it for him. As alleged *infra*, Mr. Evans's staff member, Plaintiff Bea Lake, was arrested trying to do just that, and without lawful justification and in the course of her duties.

## 49.

On June 13, 2020, Mr. Evans was again threatened with arrest and prevented from covering police conduct or the protests. Mr. Evans had previously identified himself as press and was attempting to follow the protest in a vehicle when the police stopped him and put down road spikes to prevent him and his staff from leaving. The PPB officers took Mr. Evans and his staffs' identification cards and detained them without reasonable suspicion of a crime. They were ordered to leave the area, again without any basis or justification.

## 50.

Believing they would be arrested for continuing to cover the demonstration, Mr. Evans and his crew were once again forced to leave and forego documenting the protest.

## 51.

On June 25, 2020, demonstrations were held at the Portland Police Bureau's North Precinct ("North Precinct"). The protesters chose to gather near the North Precinct to directly express their grievances about police brutality toward Black people and to be heard by police officers historically patrolling Black and African American neighborhoods. A crowd of

protesters peacefully assembled on NE Martin Luther King, Jr. Boulevard chanting, giving speeches, playing music, and expressing themselves.

**52.**

Mr. Evans covered the event. An unlawful assembly was declared, despite that Mr. Evans had again not witnessed conduct giving rise to that designation. After having declared an unlawful assembly around 12:30 AM, Defendants charged the crowd with batons, and fired riot control agents including munitions and flash bang grenades into the crowd, and released cannisters of CS spray into the crowd. Only after PPB officers had shot munitions into the crowd did Mr. Evens witness a fire from a dumpster.

**53.**

After the third or fourth time of being tear gassed by police, Mr. Evans, who was wearing contacts this night, left out of fear of the tear gas causing blindness and bodily harm.

**54.**

On June 30, 2020, a group of protesters marched to the Portland Police Association ("PPA") building located at 1868 N. Lombard Street to express their opposition to the renewal of the police union contract. When protesters arrived, officers were stationed in riot gear around the PPA. Again, Mr. Evans did not witness requisite conduct in the crowd prior to Defendants declaring an unlawful assembly, which was done just about a half hour after protesters arrived at the PPA building.

**55.**

Police formed lines and pushed protesters eastwardly, including forcibly removing protesters from not only the street but the sidewalk. After a few minutes, PPB officers began firing riot control agents into the crowd, still without any further provocation from the assembly.

**56.**

Mr. Evans was repeated shoved by the PPB officers as he attempted to follow police orders.

**57.**

Mr. Evans witnessed the Defendants direct the crowd to disperse toward North Albina Street (a street named after one of Portland's historically Black neighborhoods) and then cut off the crowd's access to that street once they had arrived there. PPB officers then launched riot control agents into the crowd and effected arrests rather than allowing the crowd to disperse in compliance with police orders.

**58.**

Mr. Evans was unable to fully document clashes and police conduct because he was forced off to the side and unable to find a reliably safe place from which to film. Throughout the evening, however, Mr. Evans witnessed that the crowd response to the police riot was limited to throwing water bottles after the police started throwing munitions into the crowd.

**59.**

Every night for nearly a week, Mr. Evans was subjected to riot control agents which subsequently interfered with his ability to concentrate during times designated for writing.

**60.**

After Mr. Evans' staff member, Plaintiff Lake discussed *infra*, was arrested without lawful justification, Mr. Evans' reasonable apprehension of Defendants likely interference, infliction of physical harm and unlawful arrest forced him to avoid documenting protests, particularly when he required the following days for writing and working.

**61.**

As a result of Defendants' use of indiscriminate force to collectively punish those

participating in and documenting the Black Lives Matter protests, Mr. Evans experiences

significant anxiety and mental distress when, at any time, he hears or sees sirens.

**62.**

Mr. Evans intends, and is required by his employment, to continue covering protests.

However, Mr. Evans has had no way of predicting when the Defendants would declare an

unlawful assembly or a riot. While protesters have never caused Mr. Evans to fear for his safety,

he no longer believes there is a safe way to report on the protests due to the Defendants' conduct

described herein.

**63.**

**<u>Plaintiff Bea Lake</u>: PPB Officers Use Dispersal Orders to Arrest and Retaliate for
     Investigating Police Conduct.**

Plaintiff Bea Lake ("Ms. Lake") is a freelance journalist. At all times relevant to this

Complaint, Ms. Lake was working on assignment as a contract journalist with Plaintiff Robert

Evans and *iHeart Media*.

**64.**

On June 6, 2020, Ms. Lake was livestreaming and documenting the demonstrations near

the Justice Center in downtown Portland. Ms. Lake was clearly identifiable as a member of the

press.

**65.**

Defendants had given instructions for the crowd to move away from the Justice Center.

**66.**

As Ms. Lake was moving in the direction indicated by PPB officers, Ms. Lake heard a PPB officer state, in sum and substance, "PRESS BADGES DON'T MATTER."

**67.**

Ms. Lake requested of this officer who had made this statement that he provide her his name.

**68.**

The PPB officer refused to provide his name. Ms. Lake reiterated her request, and in response, the officer said, in sum and substance, "YOU WANT TO GO TO JAIL?" and grabbed Ms. Lake from behind by her press gear bag.

**69.**

The PPB officer then placed Ms. Lake under arrest without lawful justification or probable cause.

**70.**

The PPB then issued Ms. Lake Citation Number #ZA0459752 without probable cause to believe a crime had been committed. Further, the citation was illegibly signed and failed to provide a printed name or an identifying officer number. Ms. Lake was released from custody at or around 12:30 AM on June 7, 2020.

**71.**

At no point did Ms. Lake fail to comply with an order to disperse, nor would one have been lawfully applied to her.

**72.**

Ms. Lake was removed from the scene and forced to cease journalistic activities for the evening.

**73.**

Defendants without any legal basis seized, detained, arrested, searched and used unlawful force against her, in retaliation for and in an attempt to dissuade her from reporting on the Black Lives Matter protests in Portland, Oregon. By reason of Defendants' actions, including their unreasonable and unlawful searches and seizures, Ms. Lake was deprived of her constitutional rights under Article I, section 8.

**74.**

Plaintiff intends to continue reporting on the protests and faces a genuine threat of unlawful arrest.

**75.**

Video of this incident is available at https://twitter.com/45thabsurdist/status/1269882746656002049.

**76.**

Additional video of the arrest is available at https://twitter.com/45thabsurdist/status/1269904040650870784?s=20.

**77.**

**Plaintiff Sadie Oliver-Grey: PPB Officers Use Dispersal Orders to Justify Excessive Force
and False Arrest and to Prevent Documenting Police Conduct.**

Ms. Oliver-Grey moved to Portland in January 2020 and works for Cascade Aids Project
as a housing services specialist. Prior to moving to Portland, she was a preschool teacher in
Oakland, California.

**78.**

Ms. Oliver-Grey was a volunteer aide supporting protesters during the 2014 Black Lives
Matter protests in Cleveland, Ohio. Ms. Oliver-Grey joined the protests in Portland, Oregon to
again support Black Lives Matter and out of a desire to add her voice to the momentum of the
movement. Her participation stems out of the belief that protest is one of the best ways to voice
an opinion when one might not otherwise have a voice. She believes that systemic change is
overdue and that protest is one of the few ways to bring about that change.

**79.**

June 2, 2020 around 11:00 pm, a group of protesters rallied outside the Justice Center and
behind a fence the police had set up as a barricade between the crowd and the Justice Center. Ms.
Oliver-Grey stood within 10 feet of the fence. She did not witness any unlawful activity and did
not witness any protester pushing or attempting to damage the fence. Ms. Oliver-Grey did not
hear police give the crowd notice to disperse or announce an unlawful assembly, when all of a
sudden an officer of the PPB began firing rubber bullets into the crowd, striking and injuring her
partner.

**80.**

Upon information and belief, the police violence caused the crowd to run away from the Justice Center. With the crowd retreating, the Defendants fired tear gas indiscriminately into the crowd. At this point, a tear gas canister landed within five feet of Ms. Oliver-Grey and knocked her down. The impact of the chemical caused Ms. Oliver-Grey to lose her vision and to dry heave. Ms. Oliver-Grey, who is asthmatic, was terrified she would have an asthma attack. Her lungs were in pain for five days.

**81.**

Ms. Oliver-Grey was in fear for her physical safety at the prospect of returning to the protests, and in that, believes the threat posed by unlawful police conduct was effective in chilling her Article I, section 8 right to free expression or speech. However, she again joined the protests because she believes her own safety as a white woman is far less at risk that the safety of Black Americans.

**82.**

On June 6, 2020 around midnight, Ms. Oliver-Grey had again joined the protests and was assembled in Chapman Square toward SW 4th Avenue in downtown Portland. Ms. Oliver-Grey did not hear dispersal orders. She also did not witness any violent or disruptive behavior on the part of those assembled with her. At that point, Ms. Oliver-Grey was not nervous and was feeling relaxed. All of a sudden, protesters began running in her direction. Upon information and belief, and without any lawful reason or provocation that she witnessed, the Defendants had fired CS spray into the crowd. She was again knocked to her knees from the gas, lost her vision and began coughing and dry heaving. In the chaos, she was separated from her partner and placed in fear for her and others' safety.

**83.**

She witnessed the crowd pulling off their masks and coughing due to the respiratory

impacts of the gas and feared not only exposure to COVID19, but increased vulnerability to its

symptoms.

**84.**

After locating her partner and continuing to join with the protesters again, she was

repeatedly exposed to CS spray over the course of the next hour or so. As Ms. Oliver-Grey

attempted to head home at or around 1:00 AM and near SW 11th Avenue and SW Yamhill

Street, she witnessed the Defendants use what she understood to be unnecessary force in placing

a young woman under arrest. Ms. Oliver-Grey noticed the arrestee appeared to be by herself. She

also witnessed no signs of the young lady was resisting arrest.

**85.**

Ms. Oliver-Grey worried for the woman's safety and wanted to document the conduct of

police. She pulled out her cell phone to take a video. At no prior point in the evening had Ms.

Oliver-Grey heard an unlawful assembly declared.

**86.**

The officers ordered her to "STOP," and in response she moved away from the officers.

**87.**

As Ms. Oliver-Grey retreated while still filming, the officers advanced upon her and

placed her hands behind her back and restrained her hands in zip ties. With her hands zip tied

behind her back, Defendants cut her off her backpack, then immediately proceeded to take the

zip ties off in order to place her in handcuffs. Defendants then removed Ms. Oliver-Grey's mask

and instructed her to sit on some stairs, where she remained for approximately 20 minutes before being placed in an enclosed police van with three other arrestees on her side of the van.

**88.**

Ms. Oliver-Grey was transported to the Justice Center where she was forced into a Tri-Met bus with approximately eight other arrestees. Ms. Oliver-Grey was led into the station to be booked, fingerprinted and photographed. In response to her questions about why she had been arrested, the officers replied, in sum and substance, she was arrested because she did not go home after an unlawful assembly was declared.

**89.**

Ms. Oliver-Grey was questioned by two officers and accused not less than three times of lying, and told, in sum and substance, "NICE BLUE EYES. YOU'RE THE FIRST I HAVE SEEN TONIGHT."

**90.**

As the officers brought Ms. Oliver-Grey to the jail at approximately 5:00 AM, where she understood many Black protesters and protesters of color had already been placed, an officer stated, in sum and substance, "GIVE HER THE TICKET AND LET HER GO HOME FOR THE NIGHT." Ms. Oliver-Grey understood she was being released because she was white.

**91.**

Ms. Oliver-Grey experienced severe pain in her lungs for days and ongoing difficulty breathing. At no relevant point were the PPB officers wearing masks to prevent the spread of COVID19, nor was she permitted to wear a mask of her own after it was removed.

**92.**

Ms. Oliver-Grey has continued to protest on subsequent days but has had to do so in fear for her physical safety and in fear of arrest without probable cause. Plaintiff has no longer been able to attend nighttime protests due to this fear.

## CLASS ACTION ALLEGATIONS

**93.**

Plaintiffs bring this action under Rule 32 of the Oregon Rules of Civil Procedure on behalf of themselves and a class of similarly situated people, who as protesters, citizen journalists, journalists, and those documenting police conduct, have been subjected to indiscriminate and excessive force, arrest without lawful justification, dispersal orders without justification, or interference with the ability to investigate, document or report on protests, or who will in the future protest or report on protest activity or the conduct of law enforcement officers on duty within the City of Portland in traditional or designated public for a ("the Plaintiff Class"). Plaintiffs' allegations are based on personal knowledge and upon information and belief. Plaintiffs bring this action on behalf of themselves and all others similarly situated. The class consists of:

(i)    all individuals who currently or who will in the future participate in or document protest activities that follow the death of George Floyd opposing police violence and white supremacy. This include protesters who engage in passive resistance to the orders of police, but does not include those who engaging in conduct beyond passive resistance.

(ii)    The class period commences on May 25, 2020 and extends to the date on which Defendants are  enjoined from, or otherwise ceases, enforcing their unconstitutional policy, practice, and custom of using indiscriminate excessive

force, including but not limited to the use of riot control agents and "less lethal" weapons, irrespective of the individualized conduct of specific protesters. Specifically excluded from the class are Defendants and any and all of their respective affiliates, legal representatives, heirs, successors, employees, or assignees.

**94.**

There is also a plaintiff subclass: Plaintiff Subclass.  Plaintiff Subclass consists of all Plaintiff Class members who were not just the targets of Defendants' use of force but were also detained or arrested solely on allegations that they committed the offense of Interfering with a Peace Officer by refusing to obey an order to disperse, pursuant to ORS 162.347(1)(b).

**95.**

The Plaintiff Class and Subclass is so numerous that joinder of all its members is impractical. Thousands of protesters and hundreds of journalists are in Portland to cover the protests that followed Mr. Floyd's murder.

**96.**

As a result of Defendants' custom, practice, policy and conduct of using indiscriminate force and interfering with the right to engage in and document the protests, the Plaintiff Class and Subclass have been and will continue to be deprived of their rights.

**97.**

There is a well-defined community of interests in the questions of law and fact affecting the class as a whole. The questions of law and fact common to the Class and Sublclass predominate over any questions affecting solely individual members of the action, and include but are not limited to:

**A.**      Whether subjecting the putative class to indiscriminate force and arrest without individualized probable cause constitutes assault;

**B.**      Whether subjecting the putative class to indiscriminate force arrest without individualized probable cause constitutes battery;

**C.**      Whether subjecting the putative class to the use and attempted use of chemical crowd control munitions and devices, the use and attempted use of various "riot control" impact munitions and devices, and the use and attempted use of baton strikes constitutes Intentional Infliction of Emotional Distress;

**D.**      Whether subjecting the putative class to the use and attempted use of chemical crowd control munitions and devices, the use and attempted use of various "riot control" impact munitions and devices, and the use and attempted use of baton strikes against the putative class caused and presented a foreseeable risk of harm and constitutes Intentional Infliction of Emotional Distress;

**E.**      For the Subclass, whether subjecting the putative class to arrest, detention, confinement and restraint for failure to disperse or passive resistance to failure to obey a law enforcement order constitutes false arrest.

**98.**

Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained class counsel who are competent and experienced in tort claims under Oregon law and the litigation of Civil and Constitutional rights cases.

**99.**

A class action is the appropriate and superior method for the fair and efficient adjudication of this controversy. Prosecuting separate actions would create risk of inconsistent or

varying adjudications, establishing incompatible standards of conduct for Defendants. Allowing this lawsuit to proceed as a class action will permit the class of similarly situated individuals to prosecute their common claims in a single forum simultaneously and efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would entail.

### 100.

The relief sought by individual class members is minor compared to the expense and burden of prosecuting individual actions, and maintenance of this suit as a class action will provide class members with a method of obtaining redress for claims that might not be practical to pursue individually.

### 101.

To the extent that any member of the Class could afford individual litigation, it would be unduly burdensome to the judicial system. Concentrating this litigation in one forum will promote judicial economy, consistency, and parity among the claims of individual members of the Class.

### 102.

Plaintiff knows of no difficulty which would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### Assault, a Claim Arising Under ORS 30.265

### 103.

Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

**104.**

In taking the actions described above, including but not limited to the use and attempted use of chemical crowd control munitions and devices, the use and attempted use of various "riot control" impact munitions and devices, and the use and attempted use of baton strikes against Plaintiffs and the Plaintiff Class, Defendant's law-enforcement employees intentionally attempted to engage in harmful or offensive contact with Plaintiffs and the Plaintiff Class while having the present ability and opportunity to actually engage in the intended harmful or coercive contact.

**105.**

Defendant's law-enforcement employees took such actions involving the use of force against Plaintiffs or the Plaintiff Class for purposes other than arrest, *i.e.*, placing Plaintiffs of the members of the Plaintiff Class under actual or constructive restraint or to take them into custody for the purpose of charging that person with an offense.

**106.**

Such actions of Defendant's law-enforcement employees were unreasonable and excessive under the circumstances and were not otherwise privileged or justified under ORS 161.205 *et seq.*

**107.**

In performing the above-described acts, defendants directly and proximately caused Plaintiffs and the Plaintiff Class to suffer economic and non-economic damages.  Plaintiffs and the Plaintiff Class seek declaratory and injunctive relief in redress.

## SECOND CLAIM FOR RELIEF
## Battery, a Claim Arising Under ORS 30.265

### 108.

Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

### 109.

In taking the actions described above, including but not limited to the use of chemical crowd control munitions and devices, the use of various "riot control" impact munitions and devices, and the use of baton strikes against Plaintiffs and Plaintiff Class, Defendant intentionally harmed, injured, and/or offensively physically contacted Plaintiffs and the Plaintiff Class.

### 110.

Defendant's law-enforcement employees took such actions involving the use of force against Plaintiffs or the Plaintiff Class for purposes other than arrest, *i.e.*, placing Plaintiffs of the members of the Plaintiff Class under actual or constructive restraint or to take them into custody for the purpose of charging that person with an offense.

### 111.

Such actions of Defendant's law-enforcement employees were unreasonable and excessive under the circumstances and were not otherwise privileged or justified under ORS 161.205 *et seq*.

### 112.

In performing the above-described acts, Defendant directly and proximately caused Plaintiffs and the Plaintiff Class to suffer economic and non-economic damages. Plaintiffs and the Plaintiff Class seek declaratory and injunctive relief in redress.

### THIRD CLAIM FOR RELIEF
**Intentional Infliction of Emotional Distress, a Claim Arising Under ORS 30.265**

### 113.

Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

### 114.

In taking the actions described above, including but not limited to the use and attempted use of chemical crowd control munitions and devices, the use and attempted use of various "riot control" impact munitions and devices, and the use and attempted use of baton strikes against Plaintiffs and the Plaintiff Class, Defendant's law-enforcement employees engaged in individual acts, or a cumulative course of acts, that they intended to inflict severe mental or emotional distress on Plaintiffs and the Plaintiff Class.

### 115.

Severe mental or emotional distress was certain or substantially certain to result from Defendant's law-enforcement employees' above-described individual and cumulative acts, when considered together in the context of the above-alleged facts, and Defendant knew that to be so.

### 116.

Defendant's law-enforcement employees' above-described individual and cumulative acts, when considered together in the context of the above-alleged facts, did in fact cause Plaintiffs and the Plaintiff Class severe mental or emotional distress.

### 117.

Defendant's law-enforcement employees' above-described individual or cumulative acts, when considered together in the context of the above-alleged facts, were egregious and consisted

of extraordinary transgressions of the bound of socially tolerable conduct or exceeded any reasonable limit of social toleration.

### 118.

In performing the above-described acts, Defendant directly and proximately caused Plaintiffs and the Plaintiff Class to suffer economic and non-economic damages.  Plaintiffs and the Plaintiff Class seek declaratory and injunctive relief in redress.

### FOURTH CLAIM FOR RELIEF
### Negligence, a Claim Arising Under ORS 30.265

### 119.

Plaintiffs and Plaintiff Class incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

### 120.

Defendant's law-enforcement employees' above-described acts, including but not limited to the use and attempted use of chemical crowd control munitions and devices, the use and attempted use of various "riot control" impact munitions and devices, and the use and attempted use of baton strikes against Plaintiffs and the Plaintiff Class, caused and presented a foreseeable risk of harm to Plaintiffs and the Plaintiff Class.

### 121.

Defendant's law-enforcement employees' above-described acts invaded and violated Plaintiffs' and Plaintiff Class's rights to be free from unlawful violence and Article I, section 8 exercise of their rights to freedom of expression and speech and press without threat of chill, punishment, or retaliation.

**122.**

Defendant's law-enforcement employees' above-described individual or cumulative acts were unreasonable and excessively dangerous in light of the risk to Plaintiffs and the Plaintiff Class and in light of the purported purposes of the acts.

**123.**

In performing the above-described individual and cumulative acts, Defendant's law-enforcement employees' directly and proximately caused Plaintiffs and the Plaintiff Class physical and/or mental harm while infringing on Plaintiffs' and the Plaintiff Class's rights to be free from unlawful violence and to attend and engage in constitutionally-protected Article I, section 8 free-speech activity without threat of chill or retaliation.

**124.**

Plaintiffs and the Plaintiff Class's physical and mental harms and injuries were within the general type of potential incidents and injuries that made defendant's conduct negligent. That is, the acts of Defendant's law enforcement employees in using indiscriminate force, violence, and collective punishment,  as described above, against lawful protestors and/or persons engaged in passive resistance created a foreseeable and unreasonable risk of harm of physical and mental harm that reasonably would likely result in infringements of Plaintiffs' and Plaintiff Class's rights to be free from unlawful violence and to attend and engage in Article I, section 8 free-speech activity without threat of chill or retaliation.

**125.**

In performing the above-described acts, Defendant directly and proximately caused Plaintiffs and the Plaintiff Class to suffer economic and non-economic damages.  Plaintiffs and the Plaintiff Class seek declaratory and injunctive relief in redress.

## FIFTH CLAIM FOR RELIEF
### False Arrest of Plaintiffs Lake and Oliver-Grey and Plaintiff Subclass

### 126.

Plaintiffs and Plaintiff Subclass incorporate all paragraphs above as if set forth fully herein.

### 127.

Defendant's employee law-enforcement officers intended and did detain, arrest, confine and otherwise restrain Plaintiffs Lake and Oliver-Grey and the Plaintiff Subclass on allegations of refusal to disperse pursuant to a law enforcement order, pursuant to ORS 162.247.

### 128.

Plaintiffs Lake and Oliver-Grey and the Plaintiff Subclass were aware that they were being detained, arrested, confined and otherwise restrained by Defendant's employee law-enforcement officers.

### 129.

Defendant's employee law-enforcement officers did not have lawful basis to detain, arrest, confine and otherwise restrain Plaintiffs Lake and Oliver-Grey and the Plaintiff Subclass on allegations arising from refusal to disperse pursuant to a law enforcement order pursuant to ORS 162.247.

### 130.

Plaintiffs Lake and Oliver-Grey and the Plaintiff Subclass were not engaged in any criminal activity, and there was not probable cause to believe that they were so engaged in activity that would give rise to a lawful order to disperse or engaged in any activity that would give rise to detention, arrest, confinement, or restraint pursuant to ORS 162.247.

## SIXTH CLAIM FOR RELIEF
### Declaratory Judgment Under Chapter 28

### 131.

Plaintiffs and Plaintiff Class incorporate all paragraphs above as if set forth fully herein.

### 132.

As a result of the conduct alleged herein, there exists a controversy of sufficient immediacy and reality to warrant issuing a declaratory judgment that Defendant and their employees may not lawfully use force in the form of chemical and impact crowd-control munitions or devices and/or physical force merely to forcefully disperse crowds of peaceful, lawful, and/or passively resistant demonstrators, and may not arrest peaceful, lawful and/or passively resistant demonstrators merely pursuant to ORS 162.427(1)(b).

### 133.

Plaintiffs and Plaintiff Class intend to continue attending protests in Portland for the purpose of expressing opposition to excessive and wrongful uses of force by law enforcement against the civilian community and especially against the Black community; for the purpose of expressing opposition to the lack of police accountability; for the purposes of documenting, reporting on, and observing the events; and for the purpose of opposing systemic white supremacy in government, law enforcement, and society.

### 134.

Declaratory relief is appropriate to address the ongoing non-speculative risk that such activity will expose Plaintiffs and the Plaintiff Class to physical harm, the intentional and/or negligent threat of physical harm, and the intentional infliction of emotional distress without lawful basis, and to arrest without justification or lawful basis.

**135.**

Declaratory judgment is appropriate as such relief would provide certainty to Plaintiffs, the Plaintiff Class, and Defendant as to whether or not Defendant and their law-enforcement employees may intentionally and/or negligently use force in the form of chemical and impact crowd-control munitions or devices and/or physical force to forcefully disperse crowds of peaceful, lawful, and/or passively resistant demonstrators.

**136.**

Declaratory judgment is appropriate as such relief would provide certainty to Plaintiffs, the Plaintiff Class, and Defendant as to whether or not Defendant and their law-enforcement employees may detain, arrest, confine and otherwise restrain Plaintiffs and the Plaintiff Class on allegations arising from refusal to disperse pursuant to a law enforcement order pursuant to ORS 162.247.

## SEVENTH CLAIM FOR RELIEF
### Injunctive Relief

**137.**

Plaintiffs and Plaintiff Class incorporate all paragraphs above as if set forth fully herein.

**138.**

The threats and harm to Plaintiffs and the Plaintiff Class posed by Defendant's law-enforcement employees' unlawful uses of force and unlawful arrest are ongoing and non-speculative. Defendant has been consistently using such unlawful force and unlawful arrests against peaceful, lawful and/or passively resistant demonstrators every night in the month preceding the filing of this complaint.

**139.**

The threats to Plaintiffs and the Plaintiff Class posed by Defendant's law-enforcement employees' unlawful uses of force and unlawful arrests are extreme, because the unlawful uses of force threaten severe physical and mental injuries and the unlawful arrests impinge on Plaintiffs' and the Plaintiff Class's constitutionally protected Article I, section 8 rights.

**140.**

The harm from Defendant's law enforcement employees' unlawful uses of force and false arrests is extreme and irreparable, because those acts threaten to substantially impinge on Plaintiffs and the Plaintiff Classes' Article I, section 8 rights of free speech and expression. Defendant's employees' actions threaten Plaintiffs and the Plaintiff Class in a special manner by acting to chill, punish, and retaliate against Plaintiffs and the Plaintiff Class for attending protests, and, thus, affect Plaintiffs and the Plaintiff Class in a manner above and beyond the basic and general way in which Defendant's law-enforcement employees unlawful uses of force would be expected to generally offend a member of the general public.

**141.**

Furthermore, there is no adequate alternative at law to injunctive relief to provide relief to Plaintiffs and the Plaintiff Class from the threats and harms posed by Defendant's law-enforcement employees' unlawful uses of force and unlawful arrests against peaceful, lawful, and/or passively resistant demonstrators.

**MISCELLANEOUS**
**All Counts**

**142.**

The Circuit Court of the State of Oregon for the County of Multnomah has jurisdiction of the above listed causes of action arising under state law as a court of general jurisdiction.

## 143.

Plaintiffs and the Plaintiff Class seek reasonable attorney fees pursuant to the court's inherent equitable powers, because this proceeding is in equity, and Plaintiffs, in filing this action, are seeking to vindicate and protect important constitutional and universal human rights that are and should be available to all citizens, Plaintiffs are not seeking to solely obtain a gain that is peculiar to themselves.

## 144.

Moreover, Plaintiffs will seek attorney fees pursuant to ORS 20.105 for the assertion of any objectively unreasonable assertions of counter claims, defenses, or grounds for appeal.

## 145.

Plaintiffs seek an award of costs as required by equity and justice pursuant to ORS 28.100.

## 146.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Plaintiff Class respectfully request that the Court enter judgment against Defendant as follows:

**A.** An order designating this action as a class action and certifying the Class and Subclass;

**B.** Declarative relief;

**C.** Permanent and temporary injunctive relief;

**D.** An award of reasonable attorney fees, costs, and disbursements, as pleaded above; and

**E.** For such other relief as the Court deems just and equitable.

Dated: August 27, 2020

RESPECTFULLY FILED,

/s/ Jane L. Moisan
**JANE L. MOISAN #181864**
Lead Trial Attorney for Plaintiffs
People's Law Project
818 S.W. 3rd Ave #221-3789
Portland, OR 97204
Direct (971) 258-1292
peopleslawproject@gmail.com

/s/ Kenneth A. Kreuscher
**KENNETH A. KREUSCHER #066189**
Kenneth A. Kreuscher Law LLC
POB 12625
Portland, OR 97211
971-303-9453
KennethKreuscher@gmail.com

*Of Attorneys for Plaintiffs*